IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DANIEL M. BARLEY, #260262,      )
                                )
          Plaintiff,            )
                                )
     v.                         ) CASE NO. 2:10-CV-00989-WKW
                                )              [WO]
RICHARD ALLEN; CORRECTIONAL     )
MEDICAL SERVICES, INC.;         )
DR. LAMPLEY; DR. BANERGEE;      )
DONALD MCARTHUR;                )
M. COPELAND;                    )
K. BAILEY;                      )
B. SUDITU;                      )
C. THOMPSON;                    )
E. ELLIS, and DR. HOOD,         )
                                )
          Defendants.[1]        )

# RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This matter is before the court on a 42 U.S.C. § 1983 action filed by Plaintiff, Daniel

M. Barley ["Barley"], an inmate currently housed at the Draper Correctional Facility in

Elmore, Alabama.  Barley challenges the medical treatment provided to him during his

---

[1] The medical defendants filed an answer on behalf of Darryl Ellis, not E. Ellis, and an answer was filed on behalf of Dr. Banerjee, not Banergee.  For the purposes of this Recommendation, the court will refer to defendants as identified in the complaint.  Barley also initially named defendants McArthur and Suditu as nurses, but they are actually physician assistants.  Inmates confined at Elmore receive medical treatment at the Staton Health Care Unit as these to correctional facilities are adjoin each other.

incarceration at the Elmore Correction Facility ["Elmore"] in Elmore, Alabama.[2]   The defendants named to this action are former commissioner Richard Allen, Correctional Medical Services, Inc., Dr. Lampley, Dr. Banergee, Donald McArthur, M. Copeland, K. Bailey, B. Suditu, C. Thompson, E. Ellis and Dr. Hood.[3]   Barley seeks declaratory and injunctive relief and money damages.  *Amended Compl. - Doc. No. 5* at 7, 13.

Pursuant to the orders of this court, the defendants filed answers, special reports and supporting evidentiary materials addressing the claims for relief raised in the complaint.  In their reports, the defendants deny they violated Barley's rights.  They further assert that this case is due to be dismissed because Barley failed to exhaust an administrative remedy available to him within the prison system as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).  Specifically, the defendants maintain that, with respect to the claims presented in the instant complaint, Barley failed to exhaust the administrative remedies available to him via the prison medical care provider's inmate grievance procedure as he failed to file a grievance and/or an appeal of any grievance about the allegations made the basis of his complaint.  *Defs.' Reports and Exhibits - Doc. Nos. 28, 29, 36, 37, 56.*

Pursuant to the orders entered in this case and governing case law, the court deems

---

[2] On November 29, 2010, the court directed Barley to file an amended complaint presenting only his medical claims and directing him to file a separate complaint if he wished to challenge the use of force in an incident that occurred on August 17, 2009.  *Order of Nov. 29, 2010 - Doc. No. 3.*  The instant case is therefore proceeding on the amended complaint filed by Barley on December 7, 2010.  *Amended Compl. - Doc. No. 5; Pl's Mot. Suppl. - Doc. No. 33; Order of Jan. 28 - Doc. No 34.*

[3] Barley originally named Nurse Austin and Nurse Parker as defendants.  These individuals were dismissed as defendants at Barley's request.  *Order of Sept. 14, 2012 - Doc. No. 51.*

it appropriate to treat the defendants' reports as motions for summary judgment.  *Order of Feb. 24, 2011 - Doc. No. 38; Order of Dec. 1, 2011- Doc. No. 57.*  Thus, this case is now pending on the defendants' motions for summary judgment.  Upon consideration of these motions and the evidentiary materials filed in support thereof, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted); *see* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[4] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the

---

[4] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*.  "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.").  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

In civil actions filed by inmates, federal courts

must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities [and correctional medical personnel].  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted). Consequently, to survive the defendants' properly supported motions for summary judgment, Barley is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate "produced nothing, beyond his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of party's own conclusory allegations is not sufficient to oppose a motion for summary judgment. . . ."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear

the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court, which is admissible

6

on its face or which can be reduced to admissible form, indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Barley fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment. *Matsushita*, 475 U.S. at 587.

## III. DISCUSSION

Barley asserts that he has multiple medical ailments and the medical staff treating him in prison has been deliberately indifferent to his serious medical needs. He states that he is recognized by the Department of Veterans Affairs and the Social Security Administration as

totally disabled.  He states he has had fourteen surgeries, including five back surgeries, left knee surgery, three surgeries to his right knee, neck surgery, left shoulder surgery, left hand surgery and two right hand surgeries.  This lawsuit concerns events that occurred after he began his incarceration at Elmore in August of 2008.

Barley states he has chronic pain and has been diagnosed with fibromyalgia, degenerative disc disease, arthritis, and he needs a herniated disc in his back removed. Barley maintains that he needs a magnetic resonance imaging (MRI) scan for a possible torn rotator cuff in his shoulder, but medical staff refuse to do it for cost reasons.  Barley asserts that he needs a knee brace, but defendant McArthur refused to give one to him or treat his knee pain.  He alleges defendant Suditu said there was nothing defendant Correctional Medical Services ["CMS"] could do to treat his hip pain, even though he has learned his hip socket is "essentially like bone rubbing bone."  *Amended Compl. - Doc.* 5 at 10.  Barley asked for a work restriction, but defendant Dr. Lampley allegedly refused to help him with his many medical problems or refer him to a specialist.  Barley tried to obtain a consultation with defendant Dr. Hood, who canceled his appointment.  Barley states he has had difficulties with defendant Nurse Bailey, who allegedly refused to order x-rays or refill his medication.  Barley saw defendant Dr. Banergee, a psychiatrist, for severe depression, and Banergee eventually reduced Barley's medication prescribed for treatment of mental issues despite his worsening mental health.  Barley states various defendants have told him he will have to wait until he is released to get his needed medical treatment for his pain, neck,

shoulder, hip, knee and back.

## A. Exhaustion

In their dispositive motion, the defendants assert that this case is due to be dismissed because before Barley filed this suit he failed to exhaust his available administrative remedies as required by the Prison Litigation Reform Act ["Prison Litigation Reform Act"], 42 U.S.C. § 1997e(a), through the inmate grievance procedure provided by CMS. *Defs.' Report - Doc. No. 37.*

The PLRA compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court on a § 1983 complaint. Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "Congress has provided in § 1997(e)(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative remedies is a precondition to litigation and a federal court cannot waive the exhaustion requirement. *Booth*, 532 U.S. at 741; *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998); *see also Woodford v. Ngo*, 548 U.S. 81, 101

(2006) ("the PLRA exhaustion requirement is not jurisdictional, and thus allowing a district court to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies").  Moreover, "the PLRA exhaustion requirement requires ***proper exhaustion***."  *Ngo*, 548 U.S. at 93 (emphasis added).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings. . . .  Construing § 1997e(a) to require proper exhaustion . . . fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to wait and bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage."  *Id.* at 90-91, 93.  The Court reasoned that because proper exhaustion of administrative remedies is necessary, an inmate cannot "satisfy the Prison Litigation Reform Act's exhaustion requirement . . . by filing an untimely or otherwise procedurally defective administrative grievance or appeal[,]" or by effectively bypassing the administrative process simply by waiting until the grievance procedure is no longer available to him.  *Id.* at 83-84; *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA).  "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement

are those that existed when he filed his original complaint." *Smith v. Terry*, 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam) (unpublished) (inmate's "attempt to amend or supplement his original complaint did not change the important historical fact: his administrative remedies were unexhausted when he filed his original complaint. Therefore, he cannot cure the exhaustion defect").

In support of their exhaustion argument, the defendants affirm that, at all times relevant to this litigation, the medical care provider has maintained a grievance procedure through which inmates may challenge medical treatment. This administrative remedy is available to all inmates, including Barley, and the policy is made known to inmates when they enter the state correctional system. *Copeland Aff. - Doc. No. 37-2* at 2. The same form is used for both medical grievances and for medical grievance appeals, and the inmate checks the appropriate box at the top of the form to identify the type of grievance filed. *Ex. A to Copeland Aff. - Doc. No. 37-4* at 79-83. At the bottom of the form are instructions regarding the procedure to complete an appeal:

> If you wish to appeal a grievance response you may file a <u>Grievance Appeal.</u> Return the completed form to the attention of the Health Service Administrator. You may place the form in the sick call request box or give it to the segregation sick call nurse on rounds.

*Id.* Defendant Copeland states that inmates are instructed to place the grievance in the sick call boxes in the chow hall, and she reviews them daily. Copeland states she provides a written response within about five days, and she encourages inmates who have complaints about their medical treatment to file grievances. *Copeland Aff. - Doc. No. 37-2* at 3.

11

Although Barley disputes receiving an orientation regarding medical procedures, the record demonstrates that he has filed at least five medical grievances during his incarceration, thus showing he knows how to file grievances. *Pl.'s Aff. of Jan. 12, 2012 - Doc. No. 61-1 at 1-2; Copeland Aff. of Feb. 23, 2011 - Doc. No. 37-2 at 3-4; Ex. A to Copeland Aff. - Doc. No. 37-4 at 79-83.* Barley filed medical grievances on September 14, 2009, October 5, 2009, November 30, 2009, December 21, 2009, and January 4, 2010. *Ex. A to Copeland Aff. of Feb. 23, 2011 - Doc. No. 37-4 at 79-83.* All of the grievances were answered within three days, and none of them concerned his mental health treatment. *Id.* According to prison records, Barley never filed a medical grievance appeal before he filed this lawsuit,[5] even though the same form is used for both the grievance and grievance appeal. Barley does not dispute his failure to file a grievance appeal before he filed this lawsuit. Instead, he states he filed "dozens and dozens of grievances," but it sometimes takes weeks to get a grievance back from medical staff, and "if I knew how to fill out a Medical Grievance Appeal, it would be hampered by the delay it would take to get the signed grievance back." *Pl.'s Aff. of Jan. 12, 2012 - Doc. No. 61-1 at 2.* To demonstrate that administrative remedies were unavailable, Barley must provide specific facts which indicate that staff inhibited him from utilizing the grievance process. *See Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 998 (6th Cir. 2004) ("nonspecific allegations of fear" and "subjective feeling[s] of futility" no excuse for

---

[5] Barley submits a grievance appeal he filed on August 22, 2012. *Pl.'s Supp. Resp. - Doc. No. 75-1 at 1.* The requirement in § 1997e(a), however, requires that administrative remedies be exhausted *before* suit is filed. Thus, the grievances that Barley filed in 2012, after he filed this lawsuit, cannot be considered in determining whether he satisfied § 1997e(a).

failure to exhaust administrative remedies).  Barley points to no such evidence.  Under the circumstances, Barley does not create a genuine question whether he filed an appeal of his medical grievances and exhausted his administrative remedies.  The record therefore supports the defense that Barley failed to exhaust his administrative remedies before he filed suit with respect to the medical treatment about which he complains in the instant cause of action.

This court may properly resolve the factual issue relating to exhaustion, *see Bryant,* 530 F.3d 1374, and finds that the facts do not support Barley's arguments concerning his alleged inability to properly exhaust administrative remedies.  The record is devoid of evidence that Barley exhausted the available grievances and/or appeals procedure with respect to the claims set forth in the present complaint, as is necessary to properly exhaust administrative remedies.  Exhaustion of available remedies applies to all prisoners in any facility, it is mandatory, and it may not be waived by the court.  *See Alexander*, 159 F.3d at 1324-26 (exhaustion requirement of 42 U.S.C. § 1997e(a) is mandatory, whether the claim is brought pursuant to § 1983 or *Bivens*); *see also Porter,* 534 U.S. 516.  Furthermore, this court may not consider the adequacy or futility of administrative remedies, but only the availability of such.  *Higginbottom v Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000), *citing Alexander,* 159 F.3d at 1323.

The court has carefully reviewed the pleadings, documents, and records filed in this matter and finds that Barley has failed to make a colorable showing that he has exhausted the administrative remedies available to him and/or demonstrated that he has been denied access

to those administrative procedures during his incarceration at that facility.[6]  *See Kozuh v. Nichols*, 185 F. App'x 874, 876 (11th Cir. 2006) (per curiam) (unpublished) (rejecting inmate's claim "that he was 'thwarted' when officials refused to respond to his grievances, leaving the grievance procedure unavailable" and noting that inmate had filed numerous informal complaints).  Based on the foregoing, the court concludes that the claims for relief presented in this cause of action are subject to dismissal as Plaintiff has not properly exhausted an administrative remedy available to him, which is required before he may proceed in this court on his claims.  *Ngo*, 548 U.S. at 87-94.

## B.  Claims for Relief

Even assuming Barley satisfied the section 1997e(a) requirement that he exhaust his available administrative remedies before filing suit, his complaint must be dismissed because Barley's claimed constitutional violations are without merit.

## 1.  Suit Against the Defendants in Their Official Capacities - Absolute Immunity

To the extent Barley sues the defendants in their official capacities, they are immune from monetary damages.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh

---

[6] While a prison official's failure to respond to a grievance within the time limits contained in an institution's grievance policy may render an administrative remedy unavailable, *see Lewis v. Washington,* 300 F.3d 829, 831-32 (7th Cir. 2002); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir. 2001); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir. 1998), an inmate cannot successfully argue that he exhausted administrative remedies where, in essence, he failed to properly employ them.

Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.  *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994).

### 2. Commissioner Allen

Barley names as a defendant Richard Allen, the Commissioner of the Alabama Department of Corrections (ADOC).  Barley does not make allegations specific to Allen, though Barley states "[t]he medical cost-cutting by private health care provider - opens liability for DOC defendants." *Pl.'s Resp. - Doc. No. 44* at 17.  Allen avers that he has no personal knowledge of the matters that Barley alleges in his complaint.  *Allen Aff. - Doc. No. 36-1* at 1.  Allen states that the ADOC contracts with health care companies to provide medical care to the inmates, and he is not aware nor does he think that the companies failed to meet the appropriate standards of care with respect to Barley.  Allen maintains that he is

not a medical professional and therefore referred all medical decisions to health care

professionals employed by the prison system's medical care provider(s). Allen avers that he

deferred to the training, knowledge, experience and expertise of correctional medical

personnel regarding treatment decisions. Allen states he has made no specific decisions with

respect to medical treatment provided to Barley. *Id.* at 2. The claims made against defendant

Allen entitle Barley to no relief as

> [t]he law does not impose upon correctional officials a duty to
> directly supervise health care personnel, to set treatment policy
> for the medical staff or to intervene in treatment decisions where
> they have no actual knowledge that intervention is necessary to
> prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550
> F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be
> brought against managing officers of a prison absent allegations
> that they were personally connected with the alleged denial of
> treatment). Moreover, "supervisory [correctional] officials are
> entitled to rely on medical judgments made by medical
> professionals responsible for prisoner care. *See, e.g., Durmer v.
> O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849
> F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County,
> Ala.*, 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Barley v. Allen, et al.*, 525 F. Supp.2d 1302, 1307 (M.D. Ala. 2007).

To the extent Barley seeks relief from defendant Allen for the treatment provided by

prison medical personnel due to his position as Commissioner of the ADOC, assuming

*arguendo* Allen exerted some authority over the manner in which those persons responsible

for the provision of medical treatment rendered such treatment, the law is well settled "that

Government officials may not be held liable for the unconstitutional conduct of their

subordinates under the theory of *respondeat superior* [or vicarious liability]. . . . *Robertson*

16

*v. Sichel,* 127 U.S. 507, 515-16 (1888) ('A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties').  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of *respondeat superior* or vicarious liability.).  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.  Thus, liability for medical treatment provided to Barley could attach to defendant Allen only if he "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions . . . and the alleged constitutional deprivation."

17

*Cottone*, 326 F.3d at 1360.

Barley, however, has presented no evidence, nor can the court countenance the existence of any evidence, which would create a genuine issue of disputed fact with respect to the claim of deliberate indifference by defendant Allen. The record is devoid of evidence indicating that Allen personally participated in or had any involvement, direct or otherwise, with the medical treatment provided to Barley. Rather, it is undisputed that Allen did not participate in the provision of treatment to Barley. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the course of treatment provided to Barley and that they provided treatment to Barley in accordance with their professional judgment upon numerous assessments of his conditions.

In light of the foregoing, defendant Allen can be held liable for decisions of medical personnel only if his actions bear a causal relationship to the purported violation of Barley's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of defendant Allen, Barley must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so. . . ." or "a . . . custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or . . . facts [that] support an inference that [Allen] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). A

18

thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Barley has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that Allen directed medical personnel to act unlawfully or knew that they would act/acted unlawfully and failed to stop such action. In addition, Barley has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which Allen failed to take corrective action; instead, the undisputed medical records indicate that Barley had continuous access to medical personnel and received treatment for his conditions. Finally, the evidentiary materials, including medical records prepared contemporaneously with treatment provided to Barley, demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by Allen. Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not warranted. Summary judgment is therefore due to be granted in favor of defendant Allen.

### 3.  The Medical Defendants

Barley complains that the remaining defendants consistently failed to treat his serious medical needs and refused to spend money on him, telling him he will have to seek treatment when he is released from prison. The medical defendants adamantly deny they acted with deliberate indifference to Barley's medical needs and, instead, maintain that Barley received appropriate treatment for his conditions.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an

inmate must, at a minimum, show that a defendant acted with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.").

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that

deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel [v. Doe],* 888 F.2d [783,] 787 [11th Cir. 1989]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice "not sufficient" to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (alterations added); *Taylor,* 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that the defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "as *Estelle* teaches, the question of whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985)

(mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530, 1534 (11th Cir. 1990).

The affidavits filed by the medical defendants address the allegations made by Barley. A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled cutaneously with treatment rendered to Barley. Dr. Banergee last saw Barley on November 3, 2010, in her capacity as a mental health psychiatrist. *Banergee Aff. - Doc. No. 28-1* at 1-2; *Ex. B to Banergee Aff. - Doc. No. 29-1* at 6. At that time, Barley stated "he was fine, taking his medications and doing alright." *Banergee Aff. - Doc. No. 28-1* at 2. Banergee points out that Barley was treated by mental health professionals on numerous occasions in 2010, as shown in his mental health records, and at the time of her affidavit he was prescribed Prozac, Vistaril and Trazodone for his diagnosed major depressive disorder and generalized anxiety disorder. *Id.* Barley's medical dosages changed over time, and in her medical opinion, Banergee felt the changes to his medication dosages "were medically appropriate and in accordance with the standard of care for the treatment of Inmate Barley's mental health

issues. The appropriateness is further supported by the improvement noted in Inmate

Barley's mental health condition." *Id.*

Defendant Lampley began her position as a site physician with the ADOC in

September 2010. *Lampley Aff. of Feb. 23, 2011 - Doc. No. 37-1* at ¶ 2. In her affidavit, she

addresses Barley's complaint that medical staff improperly cut off his pain medication when

he began his incarceration:

> At the outset it is important to note that Mr. Barley was the patient of a free-world pain clinic prior to his incarceration at Elmore. Based upon his statements regarding the pain medications that he received prior to his incarceration, it appears that Mr. Barley received a very potent course of narcotic pain medications including Oxycodone and Percocet prior to his incarceration. In fact, it appears as though Mr. Barley may have received these narcotic medications in increasing amounts over an extended period of time. In terms of treating Mr. Barley's pain, the use of increasing narcotic pain medications involves a great deal of risk to his long-term well being as well as his long-term health. First, this type of narcotic pain therapy usually results in a patient experiencing diminishing benefits from the pain medication itself. In other words, as the period of time when Mr. Barley received narcotic pain medications increased, the effectiveness of such medications would likely decrease, thereby requiring greater amounts of narcotics in order to maintain any degree of pain-management. Secondly, there are serious risk factors associated with long-term narcotic therapy. Mr. Barley may already be experiencing some significant health conditions as a result of his long-term narcotic therapy. For example, it is not difficult to conclude that Mr. Barley's gastrointestinal condition is the result of the significant impact of these medications upon his gastrointestinal tract. As a physician, I do not believe it is advisable or appropriate to simply prescribe patients medications of their choosing. With respect to Mr. Barley, I firmly believe that he will derive the greatest long-term benefit if he learns to manage his pain through the use of non-narcotic therapies and increased activity. Even if Mr. Barley received narcotic medications at this point in time, his complaints would naturally recur in the future as the effectiveness of the medication therapy decreased and I anticipate that his other chronic medical conditions would likely increase in their severity. For these reasons, I believe that the course of pain management

24

prescribed by the medical staff at Staton has been appropriately tailored for Mr. Barley's circumstances and with an appropriate degree of sensitivity to his other medical conditions.

*Id.* ¶ 4. Dr. Lampley acknowledges Barley's significant medical conditions, and on September 15, 2008, less than a month after he entered the ADOC, defendant McArthur, a physician's assistant, evaluated Barley and took his full medical history. *Id.* ¶ 7. Lampley notes that McArthur "had an extended discussion with Mr. Barley about remaining active and attempting to limit his pain through daily activity." *Id.* Among the prescriptions McArthur prescribed Barley were Ultram, a pain medication, and Mobic, a non-steroidal anti-inflammatory medication often used to treat osteoarthritis. *Id.* (describing Mobic); *Lampley Aff. of Nov. 30, 2011 - Doc. No. 56-1* at ¶ 8 (describing Ultram).

In the year following that September 2008 evaluation, Barley "received thirty-four (34) separate orders entered by the physicians and other members of the medical staff at Elmore for various medical treatments and medications including medications which were specifically prescribed for his continuing complaints of pain and discomfort in his back and neck and other extremities." *Lampley Aff. of Feb. 23,2011 - Doc. No. 37-1* at ¶ 8. In November 2008, Barley told medical staff that the pain medication was not alleviating his pain, and McArthur referred Barley to the site physician for further evaluation. *Id.* ¶ 9. Dr. Corbier, who is not named as a defendant in this action, saw Barley on November 17, 2008. Dr. Corbier reviewed Barley's history and condition, ordered an x-ray of his shoulder, and asked Barley to return for a follow-up visit. *Id.* The x-ray of Barley's shoulder was normal.

*Id.* ¶ 10.  Barley returned to Dr. Corbier on December 1, 2008, and Dr. Corbier's notes reflect that Barley's symptoms indicate chronic pain syndrome, which Lampley describes as a neurological condition "which results in an individual's nervous system constantly communicating to the brain that the patient is in pain despite there being no physical manifestation of injury, trauma or other medical defect which causes the underlying feeling of pain."  *Id.* ¶ 11.  Dr. Corbier ordered Barley to return in two months for a follow-up.  *Id.* Barley disputes Dr. Corbier's assessment, stating that he has had multiple surgeries and injuries which cause his pain, and tissue damage in his shoulder cannot be detected in an x-ray and instead requires an MRI for assessment.  *Pl.'s Resp. - Doc. No. 44* at 5.  Barley states that Dr. Corbier told him an MRI was not feasible, and when Barley asked him if an inmate was not worth the cost of an MRI, Dr. Corbier shrugged and shook his head "yes."  *Pl.'s Aff. of Feb. 26, 2011 - Doc. No. 44-1* at 3.

In December 2008, Barley submitted a sick call slip regarding pain in his shoulder, hip, and asking for renewal of pain medications.  *Lampley Aff. of Feb. 23, 2011 - Doc. No. 37-1* at ¶ 12.  When summoned for sick call on December 26, 2008, Barley failed to appear, and when he appeared for sick call three days later, he asked only for a refill of his Ultram, which already had been renewed.  *Id.* ¶ 13.  Between December 2008 and May 2009, medical staff evaluated Barley on approximately eight occasions, and they continued to monitor and treat his pain.  For example, on April 8, 2009, Barley received a shot of Depo Medrol in his shoulder to alleviate his discomfort.  *Id.* ¶14.  Barley sought medical conferences with Dr.

Hubert, who also is not a defendant in this action, and Dr. Hubert refused to order an MRI, but he did order a steroid injection and physical therapy. *Id.* at 4. Barley states the injection did not alleviate his pain, he was asked to do the physical therapy on himself without instructions, and Defendant McArthur refused to help Barley with his complaints of pain, including Barley's request for a knee brace. *Id.* at 5. Dr. Lampley admits that physical therapy is not offered on site, but she states neither the absence of the service on site nor the cost of therapy impacted her decision not to refer Barley for physical therapy. Instead, she states in her medical opinion that Barley has not demonstrated any symptoms that indicate physical therapy would improve his condition. *Lampley Aff. of Nov. 30, 2011- Doc. No. 56-1* at ¶ 12. Between January and August 2009, Barley did not file any sick call requests regarding chronic pain or pain in his extremities. *Id.* Barley states he did not file sick calls because he was depressed from his pain and tired of the staff telling him there was nothing they could do to help him. *Pl.'s Resp. - Doc. No. 44* at 6.

On August 13, 2009, Barley submitted a sick call request concerning pain in his back, hip, knee, arm, hand and shoulder. *Lampley Aff. of Feb. 23, 2011 - Doc. No. 37-1* at ¶ 15. He was seen the next day and scheduled for further evaluation, but on August 18, 2009, he was seen on an emergency basis after he was involved in an altercation with a correctional officer, after which Barley complained of injuries to his stomach and genitals. *Id.* at 16. Two days later, medical personnel noted bruises on Barley, but he refused to allow staff members to complete the evaluation. *Id.*

On August 26, 2009, Barley requested that his Ultram be reordered and his profiles updated. *Id.* ¶ 17.   A "profile" is a physician's order that allows an inmate "to deviate from the standard operating procedures and protocol." *Id.*  Dr. Lampley states it appears from the records that staff did not renew Barley's profiles because the profiles were in place and the requests for renewal were premature. *Id.*  On September 8, 2009, Barley was again evaluated, his profiles were renewed, and he was informed that his medications had been reordered. *Id.*  On September 14, 2009, Barley submitted a sick call regarding an infected toe and cold symptoms, and he was treated. *Id.* ¶ 19.  On September 16, 2009, and October 8, 2009, Barley saw medical staff but did not raise concerns about chronic pain. *Id.* ¶¶ 19-20. Barley, however, disputes the records and states he always complains about pain, but the staff is tired of hearing him complain. *Pl.'s Resp. - Doc. No.* 44 at 7.

Between January 2010 and June 2010, defendant McArthur saw Barley on at least four occasions. *Lampley Aff. of Feb. 23, 2011 - Doc. No. 37-1* at ¶ 21.  Barley complained of pain on at least two of them.  On February 5, 2010, Barley complained about the pill call process and asked to enroll in the Keep on Person ["KOP"] program where he could keep his own medications and administer them.  McArthur began the process to evaluate Barley for KOP. *Id.* ¶ 22.  Barley was enrolled in KOP on September 30, 2010. *Id.* ¶ 28.  On June 23, 2010, x-rays were taken of Barley's pelvis and hip, which showed some arthritis but did not present the sort of deformity that would account for the pain Barley described. *Id.* ¶ 23.  On June 25, 2010, Barley received a profile for an egg crate mattress from Bailey and Suditu. *Id.* Barley

28

received lab testing as part of the medical staff's monitoring of his chronic pain on June 30, 2010. *Id.*

In August 2010, Barley attended a chronic pain clinic, where he was evaluated for all his complaints of pain. *Id.* ¶ 24. Although Barley insists he never told medical staff he was receiving some relief for pain, his medical progress notes indicate he acknowledged he was receiving some relief for his pain. He was prescribed medications for his pain and chronic conditions, "such as Baclofen (a muscle relaxer), Mobic, Prilosec (a proton-pump inhibitor utilized in the treatment of GERD), Synthroid, Tylenol and Zyrtec." *Id.*; *Pl.'s Resp. - Doc. No. 44* at 7.

In early September 2010, Barley submitted a sick call request asking that someone "straighten out" his pain medications, but he failed to appear for sick call the following day. *Lampley Aff. of Feb. 23, 2011 - Doc. No. 37-1* at ¶ 25. On September 9, 2010, Barley received renewed profiles for blood pressure checks, no standing, no lifting and a back brace for 180 days, as well as a renewed prescription for Baclofen. *Id.* Barley submitted a sick call request on September 17, 2010, asking staff to reorder pain medication, but the medication had already been reordered. *Id.* ¶ 26. He was seen on September 29, 2010, for complaints of pain, and on September 30, 2010, Barley began the KOP protocol for as many of his medications as possible. *Id.* ¶ 28.

Defendant Bailey avers that she and Barley have had numerous discussions because Barley failed to follow the established procedure for obtaining refills of KOP medications.

29

*Bailey Aff. of Feb. 23, 2011 - Doc. No. 37-5* at ¶ 3.  Bailey states that Barley must file a sick call request form when his pain medication is running low, but he does not need to complete sick call requests for his non-pain medications.  *Id.*  Barley states that he was following directions from staff who told him to submit sick call requests when his medications are within ten days of expiring.  *Pl.'s Resp. - Doc. No. 44* at 9.  He complains about delays in receiving his medicines, Bailey's treatment of him, and he complains that at times his medications were out of stock, forcing him to go for days and weeks without medicine. Barley, however, provides no verified medical evidence concerning the detrimental effects of these delays on him.

On October 13, 2010, Barley was evaluated for his complaints of pain and fibromyalgia.  *Lampley Aff. of Feb. 23, 2011 - Doc. No. 37-1* at ¶ 29.  The medical staff notes indicate Barley's chronic pain would continue to be managed through adjustments to his medications.  *Id.*  Barley contends that the meeting with Dr. Lampley was over in less than twenty minutes, and Dr. Lampley was sarcastic, unprofessional and did not listen seriously to Barley's complaints.  *Pl.'s Resp. - Doc. No. 44* at 10-11.  According to Barley, Dr. Lampley said, "What do you want me to do, make you better than you were before you got injured?" *Id.* at 11.  She also told Barley that no money would be spent for him to see specialists, and he would have to wait until he was released to seek treatment.  *Id.* at 14.

According to his medical progress notes, on November 3, 2010, Barley attended a chronic care clinic for his various conditions, where he denied "any new symptoms," said his

Lyrica medication was helping him and acknowledged he had received "multiple profiles to manage his pain." *Lampley Aff. of Feb. 23, 2011 - Doc. No 37-1* at ¶ 32. Barley disputes that he said the Lyrica was helping his pain and asserts his belief that he should have been sent to a specialist because defendant Suditu shrugged his shoulders and said he did not know what else to do for Barley. *Pl.'s Resp. - Doc. No. 44* at 11. Barley had a physical on November 11, 2010, and he did not voice any particular complaints regarding the conditions that are the subject of this complaint. *Lampley Aff. of Feb. 23, 2011 - Doc. No. 37-1* at ¶ 32.

Barley submitted a sick call slip on January 4, 2011, regarding pain in his back, hip, knee and neck. He was seen the next day. *Id.* ¶ 33. On January 11, 2011, medical staff considered consulting with Dr. Hood, the Associate Regional Medical Director, but the consultation did not occur. *Id.* ¶ 34. Barley states that on January 11, 2011, Barley went to Suditu's office, and Dr. Hood stood in a corner of the room with his hands in his pockets and said nothing, refusing to engage with Barley. *Pl.'s Resp. - Doc. No. 44* at 13; *Pl's Aff. Jan. 14, 2011 - Doc. No. 44-4* at 1-2.

In his affidavit of February 23, 2011, McArthur states he evaluated Barley on a number of occasions in his capacity as a physician's assistant. *McArthur Aff. of Feb. 23, 2011 - Doc. No. 37-6* at ¶ 4. McArthur states,

> [M]y evaluations of Mr. Barley have led me to believe that Dr. Corbier's prior diagnosis of chronic pain syndrome is appropriate and warranted. If Mr. Barley had ever exhibited any specific medical condition which I believe would require the consultation of a medical specialist or third party provider, I would have sought out such a consultation. However, throughout his incarceration at Elmore, we have treated Mr. Barley's complaints of chronic pain with a

31

regimen of medications which, in fact, I understood reduced his overall level of discomfort. Unfortunately, there is no cure for Mr. Barley's chronic pain syndrome or his fibromyalgia. Therefore, Mr. Barley must understand that he will always experience some level of discomfort associated with these conditions, for which there is no single cure or corrective medical measure.

*Id.*

After Barley filed this lawsuit, he sought and received medical attention numerous times.  From January 2011 until November 30, 2011, a clinician at Staton evaluated Barley on approximately ten occasions, and Barley was never denied an opportunity to see any member of the medical staff.  *Lampley Aff. of Nov. 30, 2011 - Doc. No. 56-1* at ¶ 4.  A medical team discussed Barley's pain management issues on April 28, 2011, at which time the team "decided that we would continue to try to minimize Mr. Barley's ongoing reliance on medications while at the same time attempting to minimize his continuing complaints of pain and discomfort which do not have any readily apparent origin."  *Id.*  On November 11, 2011, Barley complained of chest pains, but he failed to appear for sick call for evaluation.  *Id.* ¶ 5. When staff evaluated him on November 21, 2011, there were "no objective signs of any cardiac issue or other underlying medical condition causing his chest pain other than his standing complaints of chronic pain."  *Id.*

From the time he filed suit until November 30, 2011, Barley received more than thirty different sets of orders from medical clinicians at Staton.  *Id.* ¶ 6.  Barley states that defendants Suditu and Lampley refused to issue him "No Work Profiles" which would allow him medical exemptions from certain activities such as work and standing because Elmore

officials, including persons who are not defendants in this action, have told CMS not to issue or recognize medical profiles even though inmates need them.  *Pl.'s Aff. of Aug. 9, 2011 - Doc. No. 52-7* at 1.  Defendant Lampley points out, however, that Barley received profiles exempting him from prolonged standing and lifting more than thirty pounds, and the profiles were extended on August 3, 2011.  *Lampley Aff. of Nov. 30, 2011 - Doc. No. 56-1* ¶ 6.  Regarding Barley's request for a "No Work Profile," Dr. Lampley states:

> [I]n my medical judgment, I cannot determine any reason for Mr. Barley not to engage in some type of physical activity in terms of the work assignments given to the inmates at Elmore.  Mr. Barley has requested that I provide him with a physician's order or Profile excusing him from performing work during his incarceration at Elmore.  More importantly, given Mr. Barley's current medical condition, I firmly believe that some physical exertion on a day to day basis would improve his overall condition.  Finally, the statement included in Mr. Barley's Supplement that the Alabama Department of Corrections does not honor the Profiles or physician's order which exclude inmates from some of the daily requirements of the various correctional institutions is simply not true.

*Id.*  Regarding Barley's pain medication, Lampley states that she stopped his Ultram pain medication in May 2011 because in her medical judgment, "it became clear after numerous interactions with Mr. Barley and numerous opportunities to monitor his condition that he no longer required Ultram and that the continuing prescription of Ultram over a continuing period of time could ultimately cause greater harm to him."  *Id.* ¶ 8.  Barley was still able to receive "non-narcotic pain relief in the form of Ibuprofen as well as other anti-inflammatory medications, including Mobic."  *Id.*  Lampley states it is not true that Barley's Lyrica was discontinued, but rather the drug is not stocked at the institutional pharmacy and requires the Regional Medical Director's Approval.  *Id.* ¶ 9.  Dr. Hood, the Regional Medical Director,

33

approved the drug shortly before Lampley submitted her affidavit.  *Id.*  In addition, staff approved Barley to receive other medications for his pain, including Baclofen and Naproxen. *Id.*  Barley has not provided verified medical evidence concerning the detrimental effect of the delay on him in receiving the drugs.

Regarding Barley's request for surgeries, Dr. Lampley states that her evaluations of Barley do not reveal objective medical evidence of degenerative disc disease in his back.  *Id.* ¶ 10.  She also has not seen objective medical data or limitations in his range of motion that would indicate he has a torn rotator cuff and requires shoulder surgery.  *Id.* ¶ 11.  In her medical opinion she has not seen objective data supporting the need for an MRI or surgical procedure.  *Id.* ¶ 12.  Addressing Barley's complaints that medical staff do not want to spend money treating him, Lampley states she "never informed Mr. Barley that cost was ever taken into consideration in any course of treatment prescribed for him. I have never informed Mr. Barley that he had 'too many medical problems for CMS to treat.'  We have never considered the filing of a lawsuit in the treatment of any inmate at Elmore or Staton."  *Id.* ¶ 13  Dr. Lampley addresses Barley's chronic pain at length:

> Mr. Barley demonstrates all of the appropriate symptoms of chronic pain syndrome – a condition which couples anxiety and depression with varying degrees of neurological pain. Problematically for clinicians, chronic pain syndrome results in a patient, like Mr. Barley, having a neurological system constantly communicating to his brain that he is in pain, despite there being no physical manifestation of injury, trauma or other medical defect. Based upon my review of Mr. Barley's records, I cannot identify any other logical or reasonable diagnosis. Unfortunately, MRIs, surgeries and physical therapy cannot cure or treat Mr. Barley's condition. While medication can provide some degree of assistance, I, along with the other members of the medical staff, must

be diligent in ensuring that we do not cause harm to Mr. Barley by
over-medicating him or otherwise eliminating the effectiveness of medication.
Therefore, I have not denied and am not aware of any other member of the
medical staff at Staton who denied Mr. Barley any necessary medical treatment
or ignored his complaints. In the event that his condition may change in the
future, we will continue to monitor his condition and make judgments as to the
appropriate means of treatment based upon the nature of his condition.

*Id.* ¶ 14.

The defendants do not dispute that Barley has extensive medical concerns.
Nevertheless, the evidentiary materials before the court demonstrate that the medical
defendants have consistently treated Barley for his conditions and have not been deliberately
indifferent to his serious medical needs.  Under the circumstances of this case, the court
concludes that the course of treatment undertaken by the medical defendants in addressing
Barley's complaints regarding his many medical ailments did not violate his constitutional
rights.  Barley claims that proper treatment is being denied because he is an inmate and that
corporate profits are put ahead of his health and well-being.  Despite these broad assertions,
Barley simply provides no evidence that the medical care and treatment rendered in regard to
the conditions about which he complains, and specifically from the named defendants, is
inadequate, detrimental to his health and well-being or reflective of any disregard by the
doctors, nurses and medical staff of a substantial risk of harm to his health.  The undisputed
medical records demonstrate that correctional medical personnel examined Barley when he
submitted a sick call request regarding his pain and other health concerns, he was seen
regularly for chronic health issues, he was prescribed various medications, steroid injections,

35

x-rays, and received profiles for not standing, no lifting, and KOP to alleviate his pain. Doctors and medical personnel conferred to determine his best plan of care, and he was provided continuous access to health care providers in an effort to monitor his conditions. Many of Barley's conflicts with staff stem from his failure to follow protocol at the institution and his disagreement with his treatment plan, particularly with regard to pain medication and MRI testing.

Based on their findings and determinations, compiled in accordance with their medical experience and professional judgment, the medical defendants did not deem it necessary to order an MRI or issue further referral to a specialist. The medical defendants likewise determined that continued use of strong pain medication and physical inactivity would be detrimental to Barley's health. The medical care Barley received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (quotation marks and citation omitted). That Barley desired a different mode of treatment does not amount to deliberate indifference. *Hamm*, 774 F.2d 1567, 1575 (11th Cir. 1985) (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment). Whether correctional medical personnel "should have employed additional . . . forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth

Amendment." *Adams*, 61 F.3d at 1545-46 (quoting *Estelle*, 429 U.S. at 107); *see also Adams*, 61 F.3d at 1546 (inmate's allegation that his prison physician did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference") (citations omitted). The mere fact that prison medical personnel and Barley's physician before he entered prison differed in their opinions as to the appropriate course of treatment for Barley does not, without more, constitute deliberate indifference. *See Garvin*, 236 F.3d at 898. Finally, any claim that specific medical procedures have been impermissibly delayed requires an inmate to put verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment. *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188-89 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Here, the court finds that no verifying evidence has been produced tending to establish any detrimental effect as a result of the medical defendants' actions or that they in any way disregarded a substantial risk to Barley's health by delaying medical services or medical care for him. *See generally Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003). It is undisputed that Barley received continuous medical care for his conditions. It is likewise evident that the medical defendants rendered treatment to Barley in accordance with their professional judgment. In addition, Barley has failed to present any evidence which indicates that the medical officials knew that the manner in which they provided treatment created a substantial risk to Barley's health and that with this knowledge consciously disregarded such

risk.  The record therefore lacks evidence, significantly probative or otherwise, showing that medical officials acted with deliberate indifference to Barley's medical needs.  Consequently, summary judgment is due to be granted in favor of the medical defendants.[7]  *Taylor*, 221 F.3d at 1258.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED;

2.  Judgment be GRANTED in favor of the defendants;

3.  This case be dismissed with prejudice; and

4.  Costs be taxed against the plaintiff.

It is further

ORDERED that the parties are DIRECTED to file any objections to the Recommendation **on or before October 18, 2013**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the

---

[7] Because Barley fails to show a constitutional violation, defendants are also entitled to qualified immunity. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  In addition, Barley fails to establish that defendant CMS is responsible for any alleged injury to him based on respondeat superior.  *See Marsh v. Butler*, 268 F.3d 1014, 1035 (11th Cir. 2001).

Magistrate Judge's Recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Sec., Inc*., 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 4th day of October, 2013.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE